[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. PROCEDURAL AND FACTUAL BACKGROUND
On February 26, 1993, the Commissioner of the Department of Children and Youth Services (now the Department of Children and Families, known as "DCF") filed an affidavit seeking orders of temporary custody (OTC) with underlying neglect petitions on behalf of Ammy F. and Jonathan F. respectively against the respondent mother and the respondent father. The OTCs were granted by the court (Silbert, J.) on that date. On March 8, 1993, the OTCs were ordered continued until further order of the court and have stayed in effect until this date. Subsequent to the filing of the OTC and neglect petitions, on March 30, 1994, DCF filed petitions for termination of parental rights of mother and father as to both Ammy and Jonathan. On May 31, 1994, the court (Handy, J.) granted DCF's motion to consolidate the neglect petitions with the TPR petition, effectuating a coterminous proceeding. CT Page 10318
The coterminous petitions allege that the minor children have been neglected in that: (1) the children have been found "neglected" and they are neglected in that they are being denied proper care and attention, physically, educationally, emotionally or morally; (2) the children are being permitted to live under conditions, circumstances or association injurious to their well-being; and (3) the children have been abused.
Prior to the commencement of trial, respondent father voluntarily consented to the termination of his rights as to both children. Trial proceeded as to respondent mother only.
The termination petitions as to both children are based on General Statutes § 17a-112(b)(3) and (4) as to both respondents. That statutory language specifies termination if "(3) the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights; or (4) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child."
The minor child, Ammy F., was born on October 2, 1985. The minor child, Jonathan F., was born October 20, 1987. At the time of trial, Ammy was almost nine years old and Jonathan was almost seven years old. Trial commenced on July 22, 1994; continued on July 29, 1994, and August 5, 1994, and concluded on August 8, 1994, with the exception of testimony from Dr. Mantell, respondent mother's expert. All parties agreed to depose Dr. Mantell on August 30, 1994, and further agreed that the transcript of Dr. Mantell's deposition testimony would be submitted to the Court for its consideration prior to rendering a decision. This procedure was utilized to accommodate respondent mother's late filed motion [dated June 23, 1994, heard and granted by the court (Downey, J.) on July 13, 1994] regarding the hiring of an outside expert. At the time mother's motion was granted, all parties agreed that any additional testimony from CT Page 10319 said expert would not delay the trial proceedings of which all counsel had had notice since April 27, 1994. All counsel waived closing argument. All parties were required to file briefs with the Court on or before September 9, 1994.
II. BURDEN OF PROOF AND PROCEDURE TO FOLLOW
 A. Procedure on the Petitions
When neglect and termination proceedings are coterminously filed, the court is required to proceed in three separate stages: (1) Adjudication of the Neglect Petition; (2) Adjudication of the Termination Petition; and (3) Disposition of Both Petitions.
(1) Adjudication of the Neglect Petition
The Court must determine, by a fair preponderance of the evidence, if the child has been neglected or uncared for as of the date the petition was filed or last amended. In re JuvenileAppeals (84-AB), 192 Conn. 254, 263, 471 A.2d 1380 (1984). If the petitioner's evidence does not support such a finding, then both petitions must be dismissed since they are predicated on the same alleged facts. If the Court finds the child to have been neglected or uncared for, disposition is deferred until a decision is made on the termination petition.
(2) Adjudication of the Termination Petition
The Court must determine next whether the proof provides clear and convincing evidence that any pleaded ground exists to terminate the parent's rights, as of the date of the filing of the petition or as of the date of its last amendment. If no such ground for termination is found, the Court must proceed on the neglect petition and consider an appropriate disposition. If at least one alleged ground to terminate is found, however, the Court must move on to the third stage.
(3) Disposition of Both of the Petitions
If grounds have been found to adjudicate the child neglected or uncared for, and to terminate Parental rights, applying the respective standards of proof, the Court must then consider whether the facts as of the last day of trial establish, by clear and convincing evidence, after consideration of the CT Page 10320 factors enumerated in § 17a-112(d), as amended, that termination is in the child's best interest.
B. Standards of Proof
A fair preponderance of the evidence standard of proof is the proper standard in neglect proceedings. In re JuvenileAppeal (84-AB), supra, 192 Conn. 264.
With regard to "termination of parental rights", that term is statutorily defined as "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent or parents so that the child is free for adoption except it shall not affect the right of inheritance of such child or the religious affiliation of such child". See General Statutes §§ 17a-93(e) and45a-707(g). Termination of parental rights is a judicial matter of exceptional gravity and sensitivity. Anonymous v. Norton,168 Conn. 421, 430, 362 A.2d 532 (1975). Termination of parental rights is the ultimate interference by the state in the parent-child relationship and, although such judicial action may be required under certain circumstances, the natural rights of the parents in their children "undeniably warrants deference and, absent a powerful countervailing interest, protection." Stanleyv. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551
(1972); In re Juvenile Appeal (Anonymous), 177 Conn. 648, 671,420 A.2d 875 (1979).
Both the child and the parents have a constitutionally protected interest in the integrity of the family. Santosky v.Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). The rights of parents to the custody of their children is an important principle that has constitutional dimensions. In reJuvenile Appeal (Docket No. 10155), 187 Conn. 431, 435,446 A.2d 808 (1982).
The constitutional guarantee of due process of law requires that the statutory grounds for termination of parental rights be established by "clear and convincing evidence," not merely a fair preponderance of the evidence. Santosky v. Kramer, supra, 455 U.S. 769. Both § 17a-112(b) and Practice Book § 1049 mandate the standard of proof as "clear and convincing evidence."In re Juvenile Appeal (84-3), 1 Conn. App. 463, 473 A.2d 79
(1984). CT Page 10321
Termination of parental rights proceeds in two stages: adjudication and disposition. The adjudicatory stage involves the issue of whether the evidence presented established the existence of one or more of the statutory grounds as of the date the petition was filed or last amended. In re Juvenile Appeal(84-AB), supra, 192 Conn. 262; In re Nicolina T., 9 Conn. App. 598,602, 520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519
(1987); In re Luke G., 40 Conn. Sup. 316, 324, 498 A.2d 1054
(1985). Only upon establishment of one or more of the statutory grounds may inquiry be made regarding the ultimate best interest of the child. Since § 17a-112(b) sets forth the statutory grounds for termination in the disjunctive, however, one ground only need be established for the granting of the petition. In reJuvenile Appeal (84-BC), 194 Conn. 252, 258, 479 A.2d 1204
(1984); In re Nicolina T., supra, 602.
III. FINDINGS OF FACT
At trial, petitioner introduced testimony and exhibits through the following witnesses: Kathy Iovino a social worker from Griswold Elementary School; Linda Taylor, an instructional assistant employed by the Griswold Board of Education; Sally Beckwith, a social services assistant with DCF; Theela Schaffhauser, a DCF social worker early in the case and later DCF's supervising social worker on the case; Sharon Buzon, a former DCF treatment worker; Leona Rogers, a DCF treatment worker; Sherry Battista, a permanent planning worker for DCF; Dr. Robert D. Meier, court-appointed psychologist; Stephanie Partyka, Ammy's former therapist; Kimberly Mitchell, a half-sister's current therapist; and Michelle Lombruno, Jonathan's current therapist. Mother introduced testimony through Tammy Cholewa, a friend of mother; Laurie Washik, a friend of mother; Julie A. S., maternal stepgrandmother and current foster parent for Jonathan; Barbara A. Canning, a substance abuse therapist at United Community Services; Virginia Fulton, the director of the Domestic Violence Program at United Services; and respondent mother testified in her own behalf. No other parties presented evidence or called witnesses.
From the combined testimony of all DCF workers, past and current, the Court was presented with the protracted history and chronology of DCF's involvement with this family. Theela Schaffhauser from DCF was mother's assigned social worker from 1984 through 1987 and supervised her social worker from 1991 through January 1, 1992. Initial issues of concern involved CT Page 10322 housing, parenting, hygiene, discipline and boundary setting. DCF was attempting to keep the family intact, but mother was not cooperative with services. DCF took mother's own disabilities into account and felt it offered mother appropriate services. These services included Young Parents Stress Program, Family Preservation Program, Visiting Nurses Association and Head Start. During this extensive time period, Ammy had cigarette burns on her body, the children were roughly and inappropriately disciplined, sleeping arrangements were not appropriate, and the children's hygiene was generally neglected. A parent aide was placed in the home in October of 1986, to address these issues, but mother refused to listen and avoided scheduled appointments. Consequently, the parent aide was terminated in October of 1987. At that time, a neglect petition was filed on Ammy's behalf; but the case was subsequently closed in 1988. Generally, Ms. Schaffhauser testified that mother is initially hostile and defensive with DCF; she then usually cooperates and accepts services on a short term basis; mother does not follow through and the same issues resurface consistently. In sum, mother has dealt with DCF "on and off" since 1982 (in the unwed mother's program) to the present time. From her experience, mother's parenting abilities are limited, and the children would not be safe with her.
Sharon Buzon, the next DCF treatment social worker, took over the case in August of 1987. Treatment issues regarding hygiene and diet were unchanged, and mother was pregnant with Jonathan at the time. In late September of 1987, DCF received a referral regarding a 1 1/2" by 2 1/2" oval bald spot on Ammy's head. DCF made mother seek medical treatment for her. Mother later admitted to Ms. Buzon that she had pulled Ammy's hair, causing the bald spot but that she was under a great deal of stress. On January 14, 1989, Ammy was adjudicated neglected and protective supervision was put in place for six months.
On October 20, 1987, Jonathan was born prematurely. Hygiene and cleanliness were still issues at that time. The Department worked with mother regarding appropriate housing; the family had been living at a campground with no running water. Mother did not like suggested shelters as she felt they were geographically unsuitable and failed to follow through with obtaining references for occupancy at a local housing project. In March of 1988, DCF felt mother and father showed some improvements in planning, but Ms. Buzon was still concerned as the family was consistently running out of food. At this time, CT Page 10323 the Department also had concerns about possible sexual abuse of both children. The Department recommended additional services for the children including Head Start and individual and family counseling. These recommendations were not well received by mother. In November, 1988, DCF closed the case as there had been no new referrals since September of 1987, and services were still in place. Ms. Buzon recognized that mother was learning disabled and had a literacy problem. She attempted to have mother improve her literacy, but mother refused any program. In deference to mother's disability, the Department offered "hands on" services which would not require mother to read.
Ms. Leona Rogers was the family's social worker between August, 1993 through January, 1994. During this time period, there were several referrals including chronic medical neglect and abuse and ongoing hygiene issues. Also during this time, Sally Beckwith, a social services assistant at DCF, reported that mother's visitation with Ammy, which Ms. Beckwith supervised, had been inappropriate. She felt the way Ammy sat on mother's lap was sexual behavior and mother's kissing of Ammy was too long; she concluded the visit early. Of sixty visits she observed, this was the only instance of this behavior she ever witnessed. Also around was the only instance of this behavior she ever witnessed. Also around this time, there were two incidents in which Jonathan had unexplained bruises on his body, in March and in May of 1992, and mother did not seek immediate medical care. Prior to DCF reopening the case, services in place included VNA, school nurses, Head Start, Summer Enrichment Program and food assistance. In August, 1993, when Ms. Rogers became the treatment worker. DCF was investigating sexual abuse and neglect allegations at this time. In the fall of 1993, both children's therapists felt it was not in either child's best interest to see their mother. At this time, Jonathan had begun making disclosures to his therapist of sexual abuse.
Sherry Battista took over the family's case for DCF in January of 1994. She was assigned the case to determine whether or not to proceed with TPRs. Based on her review of the record and the ongoing history of the same problems coupled with the sexual abuse allegations, she felt there was no alternative to the TPRs if the children's safety was to be ensured. She concluded that permanency was necessary for both children and long term foster care was not an adequate solution.
Kathy Iovino, a social worker with the Griswold Board of CT Page 10324 Education had concerns about Jonathan and Ammy in late 1992. Jonathan had some unexplained bruising and Ammy was withdrawn and appeared nervous when home was discussed. There were also constant problems with the children's lack of personal hygiene. Ms. Iovino had ongoing contact with the family due to her involvement with Ammy's and Jonathan's half-sister (not subject to this proceeding).[1] The half-sister had made disclosures of sexual abuse at home, involving all three children, of which Ms. Iovino was aware from DCF and other teachers. Linda Taylor, an instructor and assistant with the Griswold Board of Education, worked closely with the half-sister in an educational setting. In February of 1993, she made disclosures to Ms. Iovino that she and Ammy had to sleep with their father, and he was not wearing pajamas at the time. Father would close the bedroom door, kiss them on the mouth, and hump them while mother was asleep on the couch. Ms. Taylor reported this to DCF which eventually led to the Department's filing of OTCs for all three children.
Stephanie Partyka, Ammy's therapist from May through November of 1993, stated that Ammy is a very frightened child who is distrustful of people. She has great fear of her father and his violent punishment. Ammy disclosed to Ms. Partyka that both father and mother had touched her private parts. Mother had done this at home with her clothes off on mother's bed. Ammy would like to write to mother and talk to her but does not want to see her. In Ms. Partyka's expert opinion, a child from an incestuous relationship has low self esteem, distrust and destructive behavior with suicidal ideation and attempts. Ammy is at risk for shame and depression and is still anxious and fearful. She is just at the beginning of the recovery process. Ammy needs continued treatment with a child sexual abuse expert and a safe environment which is a long term placement. Ammy also needs a consistent and accepting caretaker. She is cautious about who will protect her and accept her. If the TPR is not granted and if reunification occurred, Ms. Partyka stated that Ammy would be unable to engage in continued therapy as confidentiality would have been broken; further, future therapy for Ammy is crucial.
Kimberly Mitchell, a half-sibling's clinical therapist, stated that her client disclosed to her that Ammy had touched her mother's genital and crotch area. This disclosure was unprompted and immediately reported on a Form 136 by Ms. Mitchell. (Exhibit, Petitioner's #7). CT Page 10325
Michelle Lumbruno, Jonathan's therapist, first met with him in March of 1994, when he had been referred by his school for acting out behavior. Jonathan was diagnosed as having long term depression and hyperactivity. She worked with him through July 28, 1994, when she felt Jonathan had met his short term therapeutic goals. Jonathan is very anxious and is very angry. He hates himself and threatens to hurt himself and others. He needs a structured environment with trust. He openly disclosed to Ms. Mitchell that his father made him lick his penis, his mother touched him in his "private places", and his parents hit him and swore at him. He feels responsible for not protecting his sister and half-sister from the sexual abuses of his father. However, Jonathan still loves his mother, would like to see her but not live with her. Jonathan is at risk for multiple placements if the TPR is not granted, and he definitely needs continued long term therapy.
Dr. Robert D. Meier, a clinical psychologist, conducted the court-ordered evaluations. He characterized mother as an impulsive person who does not follow through with commitments and is self-centered to her own needs. If mother has pressure from legal consequences, she might comply, but once that pressure was absent, mother's compliance disappeared. He characterized Jonathan as a child who "wanted to come across as tough", a child pretending to be in control and who stated he just laughed when he was spanked or hit; "it didn't hurt". Dr. Meier felt Ammy was the more intellectual, more competent child, who was more prepared to deal with losses. Ammy felt more affection for mother even though she was physically abused and "her dad gave her bad touches". Time is of grave significance to both children; they need an environment of trust, affection and empathy.
Dr. Meier stated that mother has concrete feelings for her children but limitations due to her own defenses and desires. She admitted to smoking marijuana to make her more sensitive to her children and the children taking judo to protect themselves. Mother took no steps to protect the children from their father, knowing that he was an abusive person. The fact that mother had been offered many services over the years with no significant parenting changes was important. He felt that if mother was provided these services, especially "hands on" services, and had not adequately used them, it was less likely she would ever use them in the future. Mother had a poor prospect of rehabilitation and ability to properly relate to children. This is due to her CT Page 10326 antisocial beliefs and attitudes, her dependency on drugs and alcohol, and the fact that she herself was in an abusive relationship with father for years. Even if mother were in individual therapy and therapy for substance abuse, Dr. Meier seriously questioned her ability to actually commit to the therapy. In his opinion, mother needs ongoing, consistent psychotherapy. If abuse allegations were true, he would not even recommend visitation with mother. In sum, mother has not provided stability to children for some time and both children desperately need stability now. Mother's profile is of an individual who would return to an abusive relationship and continue to be unable to differentiate on safety issues.
Dr. David M. Mantell, a clinical psychologist, testified through deposition for respondent mother. He never met nor interviewed mother or any of the children. He reviewed the March 19, 1993, social study prepared by DCF, Dr. Meier's January, 1994, psychological evaluation (Exhibit, Petitioner's #5), and an arrest warrant application. Prior to the deposition and subsequent to his review of those documents, Dr. Mantell sent a letter to the Court Services Officer (Exhibit, Respondent Mother's #1) in which he admits that he is reviewing limited information. He could not reach a conclusion as to whether or not father sexually abused the children; "what he has [for information] is sparse" He could not comment about DCF's cutting off mother's visitation; "he did not see that incident [himself] and [he did not] have a chance to interview the child and the mother about it"
The majority of Dr. Mantell's testimony dealt with the validation of sexual abuse allegations and their possible susceptibility to contamination. He did not conclude, however, that the children's allegations in this case were invalid or contaminated. He questioned some of the validating criteria which Dr. Meier may have used to reach his own conclusions. Dr. Mantell did emphatically state that even if a child had no trauma from sexual abuse, there still would likely be profound psychological damage to that same child.
Two of mother's friends, Tammy Cholewa and Laurie Washik, testified. Both testified that the children were always clean, had appropriate clothing and were well fed. Neither had seen unexplained bruises on any child. Both felt mother loved her children and showed affection toward them. Both stated that father was never home, was always out drinking at some bar, and CT Page 10327 mother was afraid of him.
Ms. Julie A. S., maternal stepgrandmother and current foster parent for Jonathan, stated that Jonathan had been with her for one and a-half years and is very happy. She has abided by DCF's rules and not allowed mother to visit or telephone. Jonathan is currently on medication to control his behavior and he does require continuous supervision. He has told Ms. S. that he would like to see his mother, but he doesn't want to live with her. She felt mother should be allowed contact with her children, but she still supports DCF's plan to transition Jonathan to a foster placement with Ammy which could lead to a permanent placement for both children. She would like to always be considered a resource for both children.
Barbara A. Canning, a substance abuse therapist at United Community Services, has worked with mother since June of 1993. She stated that mother is working at internalizing her recovery and making sobriety important to her. She did state that most of her information was based on mother's self-reporting. Mother's attendance with her has been good. Mother has had numerous relapses since May of 1993, with the most recent relapse occurring in July of 1994. In her opinion mother will continue to need substance abuse therapy until she has been abstinent for at least six continuous months.
Virginia Fulton, director of the Domestic Violence Program at United Services, first met mother in the spring of 1993, when mother came to the domestic violence shelter. At that time, mother appeared jumpy and scared; she had a high level of mistrust of staff and she was anxious. Ms. Fulton stated that since mother has been battered herself, DCF might be "doubly victimizing" her by taking her children away. Mother does have feelings for her children, but Ms. Fulton admitted that mother might not be able to protect her children since she cannot protect herself. Removing mother from the batterer will not necessarily improve her parenting, but it might. She could not determine whether mother could care for either Jonathan or Ammy.
Mother testified in her own behalf, stating that "all the facts are not correct", people were "leaving things out". She stated that sometimes it was hard to comply with what she was asked to do, because reading was a problem for her. Father would read to her sometimes, and when he would not, she needed to get her grandmother to help her. Mother did admit yelling at the CT Page 10328 children and hitting them once or twice on their hands or bottoms, and hitting their half-sister in the face once.
Mother denied any sexual contact with Ammy ever. As to Jonathan, mother denied sexual abuse but ultimately admitted she had spanked him and slapped his face once. She said Jonathan's bruises were from a bicycling accident. She treated his hand herself when he had it accidently slammed in the car door by his half-sister.
Mother has not seen her children since April 28, 1993, when DCF suspended visits due to the allegedly inappropriate sexual contact with Ammy at a supervised visit. She stated her children were always clean, appropriately dressed, and made their medical appointments. She said the children were well fed, except at the end of each month when she might have to go to the soup kitchen or seek charitable donations of food. Father rarely provided mother with any money.
Mother quit school in her senior year. Mother was afraid of father, but she never told anyone; he hit her at least sixty times and she required medical care twice but she was afraid to go. She tried to leave him four or five times. She admitted that she went drinking with him for a short while so they could spend time together. She admitted smoking marijuana. She denied knowing anything about father's sexual advances to the children and did not know why they did not seek her out for protection; she thought the children were afraid to tell her; she thought he was asleep in the bedroom while she slept on a couch in the hallway. She told the DCF worker that she was aware that father sometimes was sleeping naked with the children, but she did not find anything wrong with that; he was under the covers and the children were on top of the covers with their own blankets. She stated that she could protect the children if returned to her and she would hide from father, if necessary.
As to the services DCF provided and recommended, mother admitted that most were "hands on" She did state, however, that some services were not "hands on", and some DCF workers did not read her the paperwork. Mother did not think Ammy was lying to her therapist, but thinks Ammy is confused about what is going on. She does not think Jonathan is lying; in her opinion, he knows the difference between right and wrong.
Mother felt that since she has been in therapy, it has CT Page 10329 helped her in how to choose men and how to get help. Unfortunately, mother still believes that the only reason DCF took her children was because father allegedly molested them.
IV. NEGLECT AND ABUSE ADJUDICATION
The petitioner asks the Court to adjudicate Ammy and Jonathan neglected in that they are "being denied proper care and attention, physically, educationally, emotionally and morally", and they are "being permitted to live under conditions, circumstances or associations injurious to [their] well being". The petitioner also alleges the children have been abused, both physically and sexually. All of these allegations are in support of the petitioner's claims that the Court should adjudicate Ammy and Jonathan neglected.
In order for this Court to adjudicate a child as neglected this Court must be convinced by a fair, preponderance of the evidence that the child has been neglected. See Practice Book § 1043 as amended. The petitioner, the attorney for the children, and the children's guardian ad litem (G.A.L.) argue that the evidence at trial satisfies the fair preponderance of evidence standard required for an adjudication of neglect. All of these parties contend that the children have suffered physical injury other than by accidental means and suffered sexual abuse. In support of this position, the evidence shows the following: (1) Ammy had a bald spot on her head from her hair being pulled from her scalp; (2) Jonathan had been slapped in the face; (3) Jonathan had unexplained bruises on his body; (4) Ammy had made disclosures of sexual misconduct by both mother and father toward her; and (5) Jonathan had made disclosures of sexual misconduct by both mother and father toward him.
The petitioner, the children's attorney, and the children's G.A.L. all aver that the children have been denied proper care and attention. To support that position, they recite the following: (1) failure to bring Jonathan to the hospital in a timely fashion for treatment of his crushed hand; (2) failure to properly bathe the children; (3) failure to appropriately clothe the children; (4) ongoing failure to appropriately house the children; and (5) failure to properly feed the children.
Finally, the petitioner, children's attorney and children's G.A.L. argue that the children were allowed and permitted to live under circumstances that were injurious to CT Page 10330 their well being. They claim this allegation is substantiated by mother's failure to protect the children from constant sexual abuse and physical abuse by father and mother's failure to prevent children from sleeping in the same bed with father when father was naked.
Respondent mother argues that she is capable of taking care of these children now; "her ability as a parent has improved". See Respondent mother's brief at page 7.
The Court finds that the petitioner has established by a fair preponderance of the evidence that both Ammy and Jonathan have been neglected in that they have been abused, both physically and sexually; denied proper care and attention and permitted to live under circumstances or have associations that were harmful to their well-being. The Court finds the evidence relied upon by the petitioner, the children's attorney and the G.A.L. to be believable and adopts that evidence in adjudicating the two minor children, Ammy and Jonathan, as neglected.
V. TERMINATION
Having found both Ammy and Jonathan to be neglected, the Court must now look at termination of the parental rights of the respondent mother as to each of the minor children. Each statutory basis set out in § 17a-112(b) for termination of parental rights is an independent ground for termination. In reBaby Girl B., 224 Conn. 263, 618 A.2d 1 (1992). The petitioner is required to prove any ground for termination by clear and convincing evidence. In re Juvenile Appeal (84-AB), supra.
As to respondent mother, the petitioner has alleged two separate statutory grounds in its petition regarding Ammy and one statutory ground in its petition regarding Jonathan, which have occurred for not less than one year. The Court will address each ground separately.
 (1) Failure to Rehabilitate as to Ammy
[§ 17a-112(b)(2), Connecticut General Statutes]
Personal rehabilitation means "the restoration of a parent to his or her constructive and useful role as a parent".In re Migdalia M., 6 Conn. App. 194, 203 (1986), cert. denied199 Conn. 809 (1986).[2] In order to prove "failure to rehabilitate", the petitioner must show that "the parents of a CT Page 10331 child who has been found by the Superior Court to be neglected or uncared for in a prior proceeding have failed to rehabilitate as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in their child's life" In re Rayna M., 13 Conn. App. 23
(1987) (Emphasis added.) The statute requires this court to look at the level of the parents' rehabilitation as it relates to a particular child. In re Luis C., 210 Conn. 157, 167 (1989). What constitutes a reasonable time period in which rehabilitation is effectuated is a question of fact for the court In re Davon M.,16 Conn. App. 693 695-6 (1988).
"Since termination of parental rights is the ultimate interference by the state with the natural rights of parents in their children, resulting in an everlasting severance of the legal relationship, and usually the permanent separation of parent and child as well, courts must require strict adherence tothe statutory standards. In re Juvenile Appeal (Anonymous), supra at 640 (emphasis added); In re Juvenile Appeal (Anonymous),177 Conn. 648, 671, 420 A.2d 875 (1979).
In analyzing the grounds for failure to rehabilitate, the prior finding of neglect or uncared for is usually established by the trial court taking judicial notice of the court file. In re Mark C., 28 Conn. App. 247 (1992).
In the instant case, there has been no neglect adjudication in a prior proceeding.[3] Here, the petitioner filed a separate neglect petition and termination petition for Ammy and then requested the court to proceed as on a coterminous petition by virtue of DCF's motion to consolidate, granted by this Court on May 31, 1994. In fact, there has been no neglect adjudication until this Court reached that determination earlier in this Memorandum of Decision. Despite the fact there is a plethora of evidence regarding respondent mother's protracted history with DCF and her ongoing problems of not providing appropriate food, clothing and shelter for these children and her failure to follow through with numerous service providers to effectuate her rehabilitation, the Court is precluded from analyzing this evidence, because the threshold requirement for this statutory ground has not been met. Since this Court is bound to strictly adhere to the statutory standard and since no prior neglect adjudication exists for Ammy, failure to rehabilitate as a statutory ground for termination of mother's parental rights must fail here. CT Page 10332
 (2) Acts of Omission or Commission as to Ammy and Jonathan
[§ 17a-112(b)(3), Connecticut General Statutes]
This ground is established when the child has been denied by reason of act or acts of commission or omission by the mother or father the care, guidance or control necessary for his physical, educational, moral or emotional well being. As set out in § 17a-112(b)(3): "Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights . . . ." In the alternative, this ground requires proof of specific conduct that has caused serious physical injury to the child. See In re Kelly S.,29 Conn. App. 600, 615-616, 616 A.2d 1161 (1992). Specific conduct, however, can be proven through direct or circumstantial evidence. The law does not distinguish between the two as far as probative force is concerned. State v. Cimino, 194 Conn. 210, 478 A.2d 1005
(1989). "The [standard of] `clear and convincing proof' [used in the present case] denotes a degree of belief that lies between the belief that is required to find the truth or existence of the issuable fact in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution." Dacey v.Connecticut Bar Assn., 170 Conn. 520, 536-37, 368 A.2d 125
(1976).
In the present case, Ammy sustained baldness as a direct result of mother pulling her hair. She has also sustained extreme traumatic and psychological injury from the sexual abuse of her mother, including inappropriate touching of her vaginal area and being placed in a position where she touched her mother's vaginal area. She has sustained additional extreme traumatic and psychological injury from the sexual abuse of her father with whom she was forced to sleep while he lay naked in bed. Additionally, Ammy has suffered verbal and physical abuse from her mother who admitted to spanking her and losing her temper. Similarly, Jonathan sustained unexplained bruises on his body while in his mother's direct care. He also sustained extreme traumatic and psychological injury from the sexual abuse of his father who made him lick his penis and from the sexual abuse of his mother who he disclosed touched his genital area. In addition, Jonathan has suffered physical and verbal abuse from his mother who admitted to slapping him across the face, spanking him and losing her temper. CT Page 10333
It is true, that aside from the children themselves, no one witnessed either mother or father directly cause Ammy's or Jonathan's injuries. Such a lack of direct evidence does not prevent this Court, however, if it finds the evidence appropriate, to conclude that mother committed acts and/or omitted acts that endangered the well being of both Ammy and Jonathan. There is no evidence before this Court to prove that either Ammy or Jonathan was in the care of anyone other than mother or father when the physical and verbal abuse occurred or when the sexual abuse occurred.
Even if the Court assumes arguendo that mother herself did not physically, verbally or sexually abuse these children, that the injuries and trauma occurred while not in mother's care, then mother committed a parental act of omission by allowing Ammy and Jonathan to be in the care of another, including their father, while their safety was not protected. Mother contends that she was abused by and frightened of father and therefore, unable to protect the children. "While the respondent may have been victimized by her abusive husband, she is not relieved ofher responsibilities to her children". In re Mark C., supra at 255. (Emphasis added.)
This Court finds the testimony of the children's therapists and Dr. Meier, the court-appointed evaluator, to be credible. All indication from their collective testimony is that these children have been sexually, physically and verbally abused. There is no evidence that the children's disclosures are invalid and contaminated. Even Dr. Mantell, mother's expert, for whom this Court has the greatest respect, failed to conclude otherwise. To the extent that Dr. Mantell's opinion differed from Dr. Meier's, the Court relies on Dr. Meier's evaluation. He met with, interviewed and observed the children and mother. Dr. Mantell did not.
Based on this analysis, the Court finds that the petitioner has proven and established this ground, acts of commission and omission, by clear and convincing evidence, as to respondent mother for each of the minor children, Ammy and Jonathan.
V. BEST INTERESTS OF THE CHILD
The Court has found by clear and convincing evidence that one of the statutory grounds alleged by the petitioner for CT Page 10334 the termination of the respondent mother's parental rights as to both Ammy and Jonathan has been proven. Proof of one ground is sufficient for the Court to now consider and make findings on each of the criteria set out in § 17a-112(d) of the Connecticut General Statutes, as amended. These criteria and this Court's findings follow.
(1) Services Offered — Mother was offered by petitioner and at various times used the Young Parents Stress Program, Family Preservation Program, Visiting Nurses Association, Head Start, Summer Enrichment Program and the Parent Aide Program. In addition, mother was referred to shelters and housing projects to assist her in obtaining appropriate and adequate housing and for food assistance. The Department constantly recommended individual and family counseling. Mother was most always hesitant and antagonistic to services at the outset, would then willingly participate for short periods of time, and then would lose interest and not follow through with the services.
(2) Effort for reunification — DCF did all it could to keep this family together. Most services provided, including the Young Parents Stress Program, Family Preservation, Parent Aide and the VNA were in place to keep the family together as a unit. Even when the children were removed from the home, visitation was set up for mother on a regular basis. It was only when DCF found there had been inappropriate behavior at a visit and both children's therapists recommended against continued visitation, that the visits stopped.
(3) Court orders — Aside from court-ordered evaluations with which mother cooperated, there were no other court orders.
(4) Feelings and emotional ties — Both Ammy and Jonathan have feelings for their mother. They have both stated that they would like to see her some time, but neither child desires to live with mother. Mother appears to have genuine feelings for both children.
(5) Age of the children — Ammy was born October 2, 1985, and she just turned nine years old. Jonathan was born October 20, 1987; he will be seven years old at the end of the month.
(6) Efforts to adjust — Mother has recently begun substance abuse therapy and is involved in group therapy for domestic violence. Unfortunately, these efforts have come too CT Page 10335 late in serving any useful purpose in keeping her family together or protecting her children from the many forms of abuse which they have endured.
(7) Interference with relationship — There is no evidence that indicates that the petitioner or anyone else interfered with mother's ability to maintain a relationship with Ammy or Jonathan. There is no evidence that economic factors affected the situation.
The Court finds that the evidence is clear that the best interest of both Ammy and Jonathan is best served by the termination of mother's parental rights.
VII. CONCLUSION
Judgment may enter adjudicating both Ammy and Jonathan as neglected. The coterminous petitions seeking the termination of mother's parental rights with respect to Ammy and Jonathan are hereby granted. Judgment may enter terminating mother's parental rights to Ammy and Jonathan. Pursuant to § 17a-112(f), it is ordered that DCF be appointed statutory parent so that both Ammy and Jonathan can be placed for adoption. The statutory parent shall report to the Court within ninety (90) days on case plans for Ammy and Jonathan and shall submit reports at least every twelve months thereafter until such time as any proposed adoption plan(s) has become final.
Handy, J.